## STATE OF CONNECTICUT *v.* RICHARD R. QUINT
(AC 24389)

Schaller, Bishop and Dupont, Js.

---

Argued February 23—officially released August 15, 2006

*April E. Brodeur*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Mary M. Galvin*, state's attorney, and *L. Mark Hurley*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Richard R. Quint, appeals from the judgments of conviction, rendered after a jury trial, of three counts of criminal violation of a protective order, pursuant to General Statutes § 53a-223 (a), and three counts of criminal trespass in the first degree, in violation of General Statutes § 53a-107 (a) (2). On appeal, the defendant claims that (1) his convictions violated his constitutional protection against double jeopardy, and (2) he was denied his right to a fair trial as a result of prosecutorial misconduct during trial and closing arguments.[1] We disagree and affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In February, 2002, the defendant began dating and living with the victim, Francine Casey, in Milford. On July 9, 2002, following a domestic dispute, the defendant called the Milford police to the couple's residence, and both the defendant and the victim were arrested. After the arrest, the victim requested that a full no contact protective order be issued against the defendant. The court granted the request, and a full no contact

[1] The defendant also claims that the prosecutor referred to facts that were not in evidence. Specifically, the defendant claims that during closing arguments, in regard to the charge that the defendant threatened the victim, the prosecutor stated that the defendant "threatened [the victim] with bodily harm, to have one of his—her fate would be worse than death after he contacted his motorcycle gang." The state concedes that because this fact was never introduced at trial, it was improper for the prosecutor to refer to it in his closing argument. The defendant, however, was not prejudiced by this statement because he was acquitted of the charge of threatening in the second degree in violation of General Statutes § 53a-62 (a) (1). Additionally, we find no support for the defendant's assertion that but for this remark, the jury would have found the defendant not guilty of the remaining counts.

protective order was issued,[2] which provided in relevant part: "That the defendant refrain from threatening [the victim] . . . entering her dwelling or the dwelling occupied by the victim. That he may return one time with a police escort to retrieve his personal belongings. That he refrain from having any contact in any manner with the victim. That he refrain from coming within one hundred yards from the victim . . . ."

At approximately 9:55 p.m. on July 22, 2002, Officer Andrew Dunaj of the Milford police department was dispatched to the residence of the victim after the Milford police received a call from the victim's brother alleging that the defendant had violated the protective order. When Dunaj arrived, the victim informed him that the defendant had violated the protective order two times that day. The victim reported that at approximately 3 a.m., the defendant entered her residence intoxicated, instigated a verbal exchange, stole her purse and threatened her with bodily injury if she contacted the police. She stated that she did not report the violation of the protective order because she feared the defendant would retaliate against her. She also stated that at approximately 6:44 p.m., on the same day, the defendant attempted to enter the residence through a window, which was blocked by an air conditioner. The victim told Dunaj that the defendant had returned to the residence to give her back her purse but left once he heard the police were en route to the residence. She told Dunaj that although she did not want the defendant arrested, she did want to create a record of his violations of the protective order "in case anything happened."

On July 27, 2002, Dunaj contacted the defendant to inquire about the incident on July 22. According to Dunaj, the defendant admitted that he had entered the

---

[2] The protective order was issued on July 9, 2002, the same day that the victim and the defendant were arrested.

victim's residence early in the morning on July 22, but he insisted that he was invited to the residence by the victim. The defendant, however, denied threatening the victim or returning to the residence later that day. Dunaj recalled reminding the defendant of the conditions of the protective order and informing him that when he entered the residence of the victim on July 22, he violated the protective order.

Then, on August 20, 2002, Dunaj again was dispatched to the residence of the victim. When Dunaj arrived, the victim informed him that, on that day, the defendant had returned to her residence without a police escort, this time seeking to retrieve his personal belongings. She stated that the defendant did not enter the residence, but rather was in her driveway and attempted to enter the dwelling through a window. The victim's brother, who was at the residence during the relevant time period, opined that the defendant tried to enter the dwelling through a window. The victim also claimed that the defendant had instigated a verbal argument with her and left only when she informed him that she had called the police.

Later that day, Dunaj located and arrested the defendant. The defendant was charged with one count of threatening in the second degree in violation of General Statutes § 53a-62 (a) (1) in connection with the incident that occurred at 3 a.m. on July 22, 2002, as well as three counts of criminal trespass in the first degree and three counts of criminal violation of a protective order for the incidents that occurred on July 22 and August 20, 2002. Following a jury trial, the defendant was acquitted of the threatening charge but convicted of three counts of criminal trespass in the first degree and three counts of criminal violation of a protective order. Additional facts will be set forth where necessary.

## I

First, the defendant claims that his prosecution and convictions under both § 53a-223 (a) and § 53a-107 (a) (2)[3] violated his constitutional protection against double jeopardy under the fifth amendment to the United States constitution and article first, § 9, of the constitution of Connecticut. We disagree.

The defendant concedes that he failed to preserve his claim that his convictions violated the principles of double jeopardy and seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We will review the defendant's claim because the record is adequate for our review, and the claim is of a constitutional nature. The defendant cannot prevail, however, because the alleged constitutional violation clearly did not exist, and he clearly was not deprived of a fair trial. See id.

"The double jeopardy clause of the fifth amendment to the United States constitution provides: '[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb.' The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments

---

[3] General Statutes § 53a-223 (a) provides in relevant part that a "person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, or section 54-1k or 54-82r has been issued against such person, and such person violates such order." In this instance, the protective order prohibited the defendant from, among other things, (1) entering the dwelling of the victim, (2) returning to the dwelling without a police escort, (3) having any contact in any manner with the victim, (4) coming within 100 yards of the victim and (5) stalking the victim.

General Statutes § 53a-107 (a) (2), criminal trespass in the first degree, makes it a crime when a person "enters or remains in a building or any other premises in violation of a restraining order issued pursuant to section 46b-15 or a protective order issued pursuant to sections 46b-38c, 54-1k or 54-82r by the Superior Court . . . ."

for the same offense in a single trial." (Citations omitted.) *State* v. *Greco*, 216 Conn. 282, 289–90, 579 A.2d 84 (1990). One may, however, when the legislature authorizes, be convicted of multiple offenses even though the offenses arise from the same conduct. *Missouri* v. *Hunter*, 459 U.S. 359, 367–68, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983).

Here, the defendant claims that he was punished multiple times for the same offense. That is to say, he alleges that his prosecutions and convictions under § 53a-223 (a) for the crime of violating a protective order and under § 53a-107 (a) (2) for the crime of criminal trespass in the first degree constituted double jeopardy because the statutes criminalize the same conduct. "In this context, double jeopardy protection is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." (Internal quotation marks omitted.) *State* v. *Smart*, 37 Conn. App. 360, 365, 656 A.2d 677, cert. denied, 233 Conn. 914, 659 A.2d 187 (1995).

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 290–91. While the first prong requires a review of the bill of particulars, the second prong requires the application of the test set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), "to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy [and] the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines

only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Lopez*, 93 Conn. App. 257, 272, 889 A.2d 254, cert. granted on other grounds, 277 Conn. 919, 895 A.2d 791 (2006).

As the *Blockburger* test is only a rule of statutory construction and "serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) Id.; see also *State* v. *Greco*, supra, 216 Conn. 292.

Thus, the *Blockburger* test, as a rule of statutory construction, simply creates a rebuttable "presumption as to the actual legislative intent, [and] it is not a blind presumption that may be applied without regard to other relevant evidence of true intent. It would be absurd indeed to apply *Blockburger*, which was meant to help determine legislative intent, in a way that actually defeats what reason and logic dictate to be the intent." (Internal quotation marks omitted.) *State* v. *Delgado*, 19 Conn. App. 245, 252, 562 A.2d 539 (1989). The United States Supreme Court and our Supreme Court have made clear that the *Blockburger* "rule should not be controlling where, for example, there is a clear indication of contrary legislative intent [and] [t]he language, structure and legislative history of a statute can provide evidence of this intent." (Citations omitted; internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 293. "Statutory construction is a matter of law over which we exercise plenary review." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 93 Conn. App. 272.

In the present case, the parties do not dispute that the charged offenses of criminal trespass in the first degree and violation of a protective order arose from

the same acts.[4] Furthermore, the state concedes, as it must, that criminal trespass in the first degree in violation of § 53a-107 (a) (2) and violation of a protective order pursuant to § 53a-223 (a) constitute the same offense under the *Blockburger* test.[5] Thus, the determinative question is whether there is any clear indication of legislative intent to the contrary. We answer that question in the affirmative.

On the basis of our examination of the language, structure and legislative history of §§ 53a-107 (a) (2) and 53a-223 (a), we conclude that the legislature intended multiple punishments for the offense of trespassing in violation of a protective order. In reaching this conclusion, we first look to the explicit language of §§ 53a-107 (a) (2) and 53a-223 (a) and note that neither statute contains language barring multiple punishments for the same offense. We have held that because "the legislature has shown that it knows how to bar multiple punishments expressly when it does not intend such

[4] We note that, as the state has pointed out, in theory, there would be no double jeopardy issue if the charging instrument had provided that the defendant was charged with criminal trespass in the first degree pursuant to General Statutes § 53a-223 (a) for entering the victim's dwelling in violation of the protective order and under General Statutes § 53a-107 (a) (2) for his violation of the protective order by coming within 100 yards of the victim, returning to the victim's dwelling without a police escort and having contact with the victim. In such a case, the charges and the subsequent conviction would not be for the same offense. Nonetheless, the charging instrument, in this case, did not specify the particular acts for which the defendant was charged, and therefore "we resolve the ambiguity in the defendant's favor"; *State* v. *Mincewicz*, 64 Conn. App. 687, 693, 781 A.2d 455, cert. denied, 258 Conn. 924, 783 A.2d 1028 (2001); for double jeopardy purposes and assume that the charged offenses arose out of the same act. See id.

[5] This is because, on the facts of this case, it is clear that it was not possible for the defendant to commit the offense of criminal trespass in the first degree without having first committed the crime of criminal violation of a protective order. See *State* v. *Simmons*, 86 Conn. App. 381, 391–92, 861 A.2d 537 (2004), cert. denied, 273 Conn. 923, 871 A.2d 1033, cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005).

punishment . . . the absence of similar language in those statutes provides evidence that the legislature intended cumulative punishments."[6] (Citation omitted; internal quotation marks omitted.) *State* v. *Servello*, 80 Conn. App. 313, 323, 835 A.2d 102 (2003), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004).

Indeed, § 53a-223 was created by Public Acts 1991, No. 91-381, "An Act Concerning Family Violence," the same act that amended § 53a-107 by expanding § 53a-107 (a) (2) to provide a criminal penalty for those who trespass in violation of a protective order issued pursuant to General Statutes § 46b-15 or General Statutes § 46b-38c. In addition, both § 53a-223 and § 53a-107 were subsequently amended by Public Acts 1995, No. 95-214, "An Act Concerning Stalking,"[7] and Public Acts 1999, No. 99-240, "An Act Concerning Witness Protection, Cash Bail, Bail Enforcement Agents and Health Insurance for Survivors of Police Officers and Constables."[8] Thus, it is clear that the legislature was aware of these two criminal statutes and, while having the opportunity to bar multiple punishments under these statutes, did not add language to these statutes evincing such an intent.

Additional evidence of the legislature's intent to provide for cumulative punishments is that the statutes set forth separate penalties "rather than using a multiplier of a penalty established for another offense." *State* v. *Delgado*, supra, 19 Conn. App. 255. In *Delgado*, we found evidence of legislative intent to provide cumulative punishments when the statutes in question did not make

---

[6] See General Statutes §§ 53a-56a (a), 53a-59a (b), 53a-60a (a), 53a-60b (b), 53a-60c (b), 53a-61a (b), 53a-70a (a), 53a-72b (a), 53a-92a (a), 53a-94a (a), 53a-102a (a) and 53a-103a (a).

[7] Both statutes were amended by Public Acts 1995, No. 95-214, to include protective orders pursuant to General Statutes § 54-1k.

[8] Public Acts 1999, No. 99-240, amended both statutes to include, among other things, a protective order issued pursuant to General Statutes § 54-82r.

reference to each other and instead set forth their own penalty. Id. Similarly, in this instance, neither § 53a-107 (a) (2) nor § 53a-223 (a) make reference to each other, and while a violation of § 53a-107 (a) (2) is a class A misdemeanor, a violation of § 53a-223 (a) is a class D felony.

Finally, our conclusion that the legislature intended cumulative punishments is based on the fact that the interests protected by the statutes are distinguishable. As our Supreme Court noted in *State* v. *Greco*, supra, 216 Conn. 282, "[t]he United States Supreme Court found support for its conclusion that Congress intended multiple punishment for violations of two conspiracy statutes in the fact that the statutes were directed to separate evils presented by drug trafficking, namely importation and distribution." (Internal quotation marks omitted.) Id., 295; see *State* v. *Braswell*, 42 Conn. App. 264, 270, 679 A.2d 407 (1996), appeal dismissed, 243 Conn. 248, 701 A.2d 1057 (1997). Here, the obvious purpose of § 53a-223 (a) is to aid the enforcement of protective orders and to protect victims from injury or intimidation. See Public Acts 1991, No. 91-381; Office of Legislative Research Bill Analysis for Public Acts 1991, No. 91-381. Conversely, § 53a-107 (a) (2) was enacted to protect landowners or occupiers "from intrusions by unwanted persons." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 19 Conn. App. 254.[9]

---

[9] In *State* v. *Delgado*, supra, 19 Conn. App. 254, we held that, subsection (a) (1) of General Statutes § 53a-107, which "prohibits conduct involving the unlawful occupation of a premises where the actor is personally ordered by the owner or other authorized person to leave and the actor refuses to do so in direct contravention of that order," was enacted for the purpose of protecting "any possessor of land, whether titleholder or not, from intrusions by unwanted persons." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 254. These two provisions, while not identical, are similar and were enacted at the same time. As such, we conclude that the legislative purpose of § 53a-107 (a) (1) enunciated in *Delgado* is directly applicable to § 53a-107 (a) (2).

As the defendant's prosecutions and convictions pursuant to § 53a-107 (a) (2) and § 53a-223 (a) were consistent with the legislature's intent to provide cumulative punishments for the single act of trespass in violation of a protective order, we hold that the defendant has not established that a constitutional violation clearly exists and clearly deprived him of a fair trial. Thus, his claim must fail under the third prong of *Golding*.

## II

Finally, the defendant claims that he was denied his right to a fair trial as a result of prosecutorial misconduct during trial and closing arguments. Specifically, the defendant claims that the prosecutor improperly (1) asked the defendant to comment on the veracity of other witnesses, and (2) vouched for the credibility of the state's witnesses and expressed his personal opinion.[10] We disagree.

We begin by setting forth the applicable standard of review. Although, the defendant did not object to any of the alleged misconduct challenged on appeal, he maintains that he is entitled to a new trial on the ground that the alleged misconduct deprived him of a fair trial. "We review unpreserved claims of prosecutorial misconduct by applying the factors set out in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . [I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process

---

[10] The defendant also claims that the prosecutor "scoffed at the defendant's testimony," implying that he was not telling the truth, and "allied himself with the jurors . . . ." We note that we read transcripts in monotone, and we decline the defendant's invitation to impute misconduct where such misconduct could be revealed only by the tone of the speaker and not on the face of the printed record. *State* v. *Vazquez*, 79 Conn. App. 219, 228–29, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003).

right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . .

"Only if we conclude that prosecutorial misconduct has occurred do we then determine whether the defendant was deprived of his due process right to a fair trial. In doing so, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following *Williams* factors: the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *McCleese*, 94 Conn. App. 510, 516–17, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006).

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great

influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Boyd*, 89 Conn. App. 1, 29, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005).

As it relates to prosecutorial misconduct during closing arguments, we have held that "[i]n determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . .

"In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . Last, we note that [w]e do not scrutinize each individual comment in a vacuum, but rather

we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Citations omitted; internal quotation marks omitted.) Id., 29–30. With those basic tenets in mind, we now turn to the defendant's claims on appeal.

## A

First, the defendant claims that the prosecutor improperly asked the defendant to comment on the veracity of other witnesses and that the prosecutor continued this improper conduct by emphasizing the defendant's testimony during closing arguments. We are not persuaded.

The following additional facts are necessary for the resolution of that issue. It will suffice to say that the evidence at trial distilled to a credibility contest between the defendant and the state's witnesses due to the nature of the charged offenses and the conflicting testimony of the witnesses. In this regard, the state's key witness was the victim, who testified that the defendant violated the protective order and trespassed twice on July 22 and once on August 20, 2002. Although the victim and the victim's brother were both present when the defendant violated the protective order on August 20, only the victim was present when the defendant committed two violations of the protective order on July 22. Indeed, as to the July 22 incidents, the testimony of Dunaj and the victim's brother was based on representations made to them and not on their personal observations.

During the defendant's case-in-chief, defense counsel asked the defendant if on July 22 he violated the protective order by either entering the victim's dwelling, having any contact with the victim or threatening,

harassing, assaulting, molesting or sexually assaulting the victim. When the defendant replied, "No, I did not," the following exchange occurred:

"Q. You are telling this jury and the court that [the victim] is lying?

"A. Yes, I am."

On cross-examination of the defendant, the prosecutor adopted this line of questioning, begun by defense counsel, and delved into the subject of the veracity of all of the state's witnesses. The defendant was asked the following:

"Q. Do you believe [the victim's] testimony is fabricated?

"A. Yes, I do.

"Q. And we are to believe you that you weren't there?

"A. Yes.

"Q. Did you hear Officer Dunaj testify that he had a phone conversation with you . . . [and] that you admitted going on the property . . . ?

"A. As I already said.

"Q. So, he's lying, too.

"A. That's not what I told him.

"Q. So, is it your testimony that [the victim] and Mr.— Officer Dunaj are both lying to this jury?

"A. Well, Mr. Dunaj must be, and [the victim] definitely is.

"Q. Okay. But you're not; you are telling the truth—

"A. Yes, I am."[11]

---

[11] Defense counsel only once objected to this line of questioning, on the ground that a question had been asked and answered.

During closing argument, the prosecutor remarked on the defendant's testimony that the state's witnesses were "fabricat[ing]" their testimony and resolved that in fact, the only person with a motive to lie was the defendant.[12]

The defendant claims that even if the prosecutor's questions asking the defendant to comment on the veracity of the victim were invited by defense counsel's question, it was improper for the prosecutor to ask the defendant to comment on the veracity of all of the state's witnesses and then to highlight the defendant's testimony concerning the veracity of the state's witnesses in his closing arguments.

"It is a well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity. . . . That is so because such questions not only invade the province of the jury, in that determinations of credibility are for the jury to decide, but those questions also have no probative value because

---

[12] The prosecutor stated: "But we are dealing with July 22 and August 20 here. What happened then? Who claims all the other witnesses are lying? Who has the motive to fabricate his testimony? Did anyone expect that he was going to get on the [witness] stand and say, 'Yes, I violated this order. Yes, I trespassed'? Of course not, he is going to deny it. . . . Who has the most interest in the outcome of the trial? Of the five witnesses in this case, only one is charged with seven violations of the Connecticut General Statutes. [The defendant] has the motive to fabricate. [The defendant] is the answer to all these questions. [The defendant] testified under cross-examination when I asked him why the other witnesses would lie, and he said, well, the officer would lie because he needs, he wants to get the conviction. The police officer's involvement in a criminal case ends with the arrest. . . So, he has no interest in the outcome of the case. I'm not paid for convictions or losses at trial. I am paid to present evidence as it is presented to me through the police officers for you . . . . [The victim] testified [that] she just wanted him to stay away. She initially didn't even want him arrested. . . . So, her interest is to terminate this relationship . . . . [The defendant] is the one on trial. He has the most to lose. Thus, it's our contention [that] his testimony was completely fabricated. And remember, his testimony was in direct controversy with the other people."

they are not helpful to the jury in assessing a witness' credibility. . . .

Nevertheless, "[a]s a general rule . . . if a party delves into a particular subject during examination, he is said to have opened the door for further examination regarding that subject. . . . Once that door was opened, the prosecutor had the right to inquire into the defendant's statement and ask whether all the witnesses in the case were lying." (Citation omitted; internal quotation marks omitted.) *State* v. *Sells*, 82 Conn. App. 332, 338, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004).

Indeed, we have reached the same conclusion on facts analogous to those in this case. In *Sells*, we held that when defense counsel, on direct examination, asked the defendant to comment on the veracity of the state's witnesses, thus opening the door on the subject of the credibility of the state's witnesses, the prosecutor "had a right to inquire into the defendant's statements and ask whether all the witnesses in the case were lying." Id. Thus, the prosecutor, in this case, did not commit misconduct in cross-examining the defendant on the issue of the credibility of all of the state's witnesses, and it was not improper for the prosecutor to emphasize the defendant's testimony in closing argument.[13]

---

[13] We believe, however, that a word of caution regarding the "opening the door" doctrine is appropriate. As we have stated, "[t]he doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 187, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

## B

Next, the defendant claims that the prosecutor, during the trial and in closing argument, improperly vouched for the credibility of the state's witnesses and expressed his personal opinion, consequently depriving the defendant of a fair trial.

### 1

We first address the defendant's claim that the prosecutor improperly expressed his personal opinion during the trial. In particular, the defendant points out that on cross-examination, the prosecutor repeatedly asked the defendant if he was telling the truth, if he was perjuring himself and if he understood the penalty for perjury. Although defense counsel raised no objection to this line of questioning at trial, the defendant claims on appeal that these questions constituted impermissible statements of personal opinion. The state argues in response that the prosecutor's questions were not improper cross-examination because "[o]nce the defendant decided to testify, he opened himself up to legitimate probing questions testing his credibility." We agree with the state.

It is axiomatic that when a defendant chooses to testify, he puts his credibility at issue, and the state is free to "challenge the defendant's version of the facts and to argue that the defendant had tailored his testimony to fit the state's case, provided that such an argument [is] linked solely to the evidence and not, either directly or indirectly, to the defendant's presence at trial [i.e., his exercise of a constitutional right]." (Internal quotation marks omitted.) *State* v. *Alexander*, 50 Conn. App. 242, 250, 718 A.2d 66 (1998), rev'd in part on other grounds, 254 Conn. 290, 755 A.2d 868 (2000). Thus, we conclude, the prosecutor's questions during cross-examination were not an expression of his personal opinion and, thus, did not constitute misconduct.

2

Next, the defendant argues that during closing arguments, the prosecutor improperly expressed his personal opinion. The record reveals that during summation, the prosecutor stressed that the defendant's testimony was inconsistent with the testimony of all of the state's witnesses, and that the state's witnesses were telling the truth and that only the defendant had a reason to fabricate his testimony.[14] Defense counsel

[14] The prosecutor stated: "Why, ladies and gentlemen, would the officer fabricate testimony, fabricate information that's presented to the state's attorney's office and to a judge? There is no reason because the officer is telling the truth based on his investigation. Why would [the victim] make up this whole story and subject herself to perjury for the charge of issuing a false statement? She's not. She is here in court. She is telling an honest story with respect to what happened on those occasions. Why would John Casey [the victim's brother] fabricate a story and submit himself to [charges of] issuing a false statement or perjury? Because what he told you is true. He is living with his sister, [the defendant] showed up on August 20, 2002, attempted to enter the dwelling and left before the police were there, and Mr. John Casey called the police.

"These witnesses are all sworn in. They all understand the obligation of an oath.

"The other witness we heard from is [the defendant]. [The defendant] is the one charged with these crimes. [The defendant] is the one who denied ever going on the property. Ladies and gentlemen, if you believe the testimony that he never went there, then your deliberations should then deliver a verdict of not guilty.

"But consider. Why would these other witnesses fabricate their testimony when they have nothing to gain or lose depending on the outcome of this trial? They are merely here to tell the truth.

"[The defendant], however, is the person that is charged with the crime and, as the judge will instruct you, it is your decision based on the evidence presented whether or not [the defendant] violated any of these state statutes and, you know, we are dealing with three charges of violation of a protective order, and three charges of criminal trespass [in the first degree] and one count of threatening. . . .

"So, ladies and gentlemen, when you really add up all the testimony, the state feels it's fairly clear beyond a reasonable doubt what happened here. What happened here is that [the defendant] should be found guilty for his actions on July 22, 2002, and August 20, 2002.

"During your deliberation process, I'm going to ask you to carefully consider each of the witnesses' testimony from this chair and think about the things we talked about. If you feel that [the defendant] was the one telling the truth, then it's a not guilty [verdict], but I think clear and careful consideration of the evidence will show you that the four other witnesses, who have

did not object to the prosecutor's comments during closing argument. Instead, defense counsel adopted the same method of argument and offered his personal opinion as to the credibility of the witnesses.[15]

Although the state concedes that the prosecutor, during closing argument, improperly expressed his personal opinion, the state maintains that the misconduct

no interest in the outcome of the case, are the ones telling the truth and [that the defendant] has fabricated testimony for you to find him not guilty.

"The other thing to consider, the only person other than myself, [defense counsel], the clerk, the court reporter and the judge, who sat through the entire trial, in addition to the jurors, was [the defendant]. The other witnesses were kept out of the courtroom, and they were called in individually. So, they didn't hear each other's testimony. [The defendant] heard the whole trial, the whole state's case. So, he had a perfect opportunity to fill in the blanks, to get up there and deny everything they said as all lies.

"He heard all the testimony; the other witnesses didn't. The other witnesses came in independently and testified to you ladies and gentlemen truthfully."

During rebuttal, the prosecutor stated: "So, this is a play on words that [defense counsel] wants you to believe that [the victim] is lying. She wasn't lying. . . . If you believe it's not a violation, you'd have to totally discount all of [the victim's] testimony, and why would you do that? She is telling the truth as she recollects it. She told the officer on the very day [that the defendant] came over twice, clearly in violation of the order. She was there August 20, she was in the yard, she was not in the residence. When John Casey testified [that] she was out, she was out of the house, she wasn't out of the area. Again, if she was out of the area, she couldn't have talked to the police officer who arrived shortly after the call came in. [The victim] is not lying. John Casey is not lying. Officer Dunaj is not lying. There is only one person that's lying, and that's the person who has the interest in the outcome of the case."

[15] Defense counsel stated: "The state asked you who is lying? Why would [the victim] lie? I don't know. Could it be that she wanted an easy way to get [the defendant] out of the house, an easy way to end this relationship? Possibly. Could it be because she wanted the goods that were at her home? I don't know. I don't know why she is lying, but I do submit to you that she is.

"[The defendant] testified to it. I don't know whether you believed [him] or not. I did. I really did. When I saw [him] testify and he looked at you and he told you he was not at the property, I believed him. He didn't have to say that. The state didn't prove its case beyond a reasonable doubt, even if he was there. . . .

"He told you, in spite of that, that he wasn't there. [The victim] told you that he was. [The victim] also told you that she was. We know now, after this morning, that [that] isn't true. [The victim] was not present on at least one of the occasions in question, August 20 at seven o'clock. So, who is

did not deprive the defendant of a fair trial. We agree with the state.

Even if we assume arguendo that the prosecutor's remarks were an improper expression of his personal opinion, we next must determine whether the defendant was deprived of his due process right to a fair trial. "As we have stated, our inquiry into whether the defendant has been prejudiced by prosecutorial misconduct is guided by an examination of the *Williams* factors: the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *McCleese*, supra, 94 Conn. App. 520–21.

The state concedes that the prosecutor's comments on the credibility of the witnesses were not invited by defense counsel's conduct or argument. The state also acknowledges that credibility was a critical issue in this case and that there was no incriminating physical evidence. As our Supreme Court has stated, cases that are lacking conclusive physical evidence and hinge on the jury's determination of the credibility of the victim are not particularly strong cases. *State* v. *Ceballos*, 266 Conn. 364, 416–17, 832 A.2d 14 (2003); *State* v. *Singh*, 259 Conn. 693, 724–25, 793 A.2d 226 (2002); see *State* v. *Singleton*, 95 Conn. App. 492, 503, 897 A.2d 636, cert. denied, 279 Conn. 904, 901 A.2d 1228 (2006).

The misconduct in this case, however, was neither frequent nor severe because it was confined to only a portion of the closing argument. See *State* v. *Pouncey*, 40 Conn. App. 624, 636, 673 A.2d 547 (1996), aff'd, 241 Conn. 802, 699 A.2d 901 (1997). Although the court did

lying? I submit that it is [the victim] who is lying. Why? I can't tell you why; I can only speculate."

not issue any specific curative instruction, its prelimi-
nary and final instructions to the jury likely cured the
misconduct, as it reminded the jury that it "alone deter-
mine[s] the weight, the effect, the value of the evidence,
as well as the credibility and believability of the wit-
nesses."[16] Although "a general instruction does not have
the same curative effect as a charge directed at a spe-
cific impropriety, particularly when the misconduct has
been more than an isolated occurrence . . . [where]
[t]he defendant fail[s] . . . to object to this comment
. . . to bring [the improper comment] to the attention

---

[16] The court stated in relevant part: "Your function, the function of the
jury is to determine the facts. You are the sole and exclusive judges of the
facts. You alone determine the weight, the effect, the value of the evidence,
as well as the credibility and believability of the witnesses. . . .

"You must consider and weigh the testimony of all the witnesses who
appear before you. You alone are to determine whether to believe any
witness to the extent to which any witness should be believed. . . .

"It is your responsibility to resolve any conflicts in testimony which may
arise during the course of the trial and to determine where the truth lies."

The court also stated at the conclusion of closing arguments: "You alone
are responsible for determining the facts. It is your exclusive province to
deal with the evidence and determine what the facts are, and to reach the
final conclusion as to whether the accused is guilty or not guilty. . . .

"By applying the law as I give it to you to the facts as you find them to
be, you will arrive at your verdict. You are the sole judges of facts.

"It is your duty to find the facts. You are to recollect and weigh the
evidence and form your own conclusions as to what the ultimate facts
are. You may not go outside the evidence introduced in court to find the
facts. . . .

"Also, your verdict must be based absolutely and solely upon the evidence
given to you in the trial of the case. . . .

"You should keep in mind that the arguments, the statements by the
attorneys in final argument or during the course of the case, are not evidence.
You should not consider as evidence their recollection of the facts, nor their
personal beliefs as to any facts or as to the credibility of any witness. Nor
any facts which any attorney may have presented to you in an argument
which that attorney's knowledge was not present—was not presented to
you as evidence during the course of the trial.

"Furthermore, I emphasize to you that if there is any difference between
what any attorney recalls as the evidence and what you recall as the evidence,
it is your recollection that controls. Follow your recollection, not anyone
else's."

of the trial court, [the defendant] bears much of the responsibility for the fact that [this] claimed impropriet[y] went uncured." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 401–402, 897 A.2d 569 (2006). Indeed, we have repeatedly stated that "defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel [may not have] believe[d] that it was unfair in light of the record of the case at the time." (Internal quotation marks omitted.) Id., 402. Additionally, of note is the fact that the jury found the defendant not guilty of the threatening charge, which indicates that the jury's deliberations were not overborne by the prosecutor's improper opinions as to the credibility of witnesses. See *State* v. *Doriss*, 84 Conn. App. 542, 548, 854 A.2d 48, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004).

Thus, even if we were to conclude that the prosecutor's comments during closing arguments were improper, the defendant was not prejudiced by the misconduct and was not deprived of his right to a fair trial. See *State* v. *Warholic*, supra, 278 Conn. 400–404.

The judgments are affirmed.

In this opinion DUPONT, J., concurred.

SCHALLER, J., dissenting. Although I agree with the majority on the resolution of the double jeopardy claim, I respectfully disagree on the disposition of the claim of prosecutorial misconduct. Because I believe that prosecutorial misconduct of a classic nature occurred during both cross-examination and closing argument, and deprived the defendant, Richard R. Quint, of a fair trial in this case, which hinged on the credibility of witnesses, I would reverse the convictions.

Prosecutorial misconduct claims are addressed frequently by this court and by our Supreme Court. It is

useful, as the majority has done, to review the relevant standards of review and principles of law as established by our Supreme Court. Even when those standards and principles are accurately interpreted and precisely applied, however, because they are fact specific, they may appear to produce inconsistent results. When the prosecutorial misconduct cases decided by the Supreme Court and this court are assessed together, it may be difficult to identify actions that will consistently be deemed misconduct and to define precisely the pattern of misconduct that will be deemed to deprive a defendant of the right to a fair trial.[1] A review of several pivotal cases of our Supreme Court, however, provides guidance as to the prevailing standards and the method for analyzing prosecutorial misconduct claims.[2]

In the present case, the majority concludes that the prosecutor did not engage in misconduct by cross-examining the defendant on the veracity of the state's witnesses and subsequently emphasizing that testimony during closing argument. In addition, the majority concludes that the prosecutor's expressions of personal opinion during cross-examination were not misconduct and merely assumes arguendo that the prosecutor engaged in misconduct by expressing his personal opinion during closing argument. I believe that each of these instances constituted misconduct and that the defendant was deprived of his right to a fair trial. Furthermore, I suggest that the majority's determination that the prosecutor did not engage in misconduct by cross-examining the defendant on the veracity of the state's

[1] Claims of prosecutorial misconduct pose a unique problem to courts because they involve a court labeling a prosecutor's actions during a trial as "misconduct," a term that may suggest *ethical* misconduct. In reality, the improprieties claimed can range from ethical misconduct to mere evidentiary improprieties.

[2] For a comprehensive and scholarly study of the development of prosecutorial misconduct case law in Connecticut, see C. Champagne, "Prosecutorial Misconduct in Connecticut: A Review," 78 Conn. B.J. 196 (2004).

witnesses and emphasizing that testimony during closing argument resulted from a misapplication of the prevailing method of analysis. In short, that determination was made by taking into account, in the first step of the analysis, a *Williams* factor; see *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987); that applies only to the second step of the analysis, that is, whether a due process violation occurred. Because this case hinged almost exclusively on the relative credibility of witnesses, I conclude that a finding of prosecutorial misconduct leads to a conclusion that the defendant's due process right to a fair trial was violated.

I agree in general with the majority's statement of the current principles that our Supreme Court has articulated to govern prosecutorial misconduct claims. As the majority correctly states, in examining claims of prosecutorial misconduct, Connecticut courts presently engage in a two step analytical process. First, we consider whether "misconduct occurred in the first instance"; (internal quotation marks omitted) *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004); and second, if misconduct has occurred, we determine "whether that misconduct deprived [the] defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id. Because I conclude, however, that this process was not precisely applied in the resolution of the present claim, I wish to emphasize key points of the pivotal Supreme Court cases. Although our Supreme Court has addressed prosecutorial misconduct claims for more than one century, for my present purposes, I will focus on the key Supreme Court decisions beginning with *State* v. *Williams*, supra, 204 Conn. 523, and concluding with *State* v. *Stevenson*, supra, 563.

In *Williams*, decided in 1987, the defendant claimed that the prosecutor engaged in various instances of misconduct during the cross-examination of the defendant and a defense witness, as well as during closing

arguments. *State* v. *Williams*, supra, 204 Conn. 524. In addressing the defendant's claims, the *Williams* court first noted that prosecutorial misconduct may occur during both cross-examination as well as during closing arguments.[3] The court next sought to determine whether the alleged misconduct was so serious as to amount to a denial of the defendant's due process right to a fair trial. To assist in this determination, the court set forth a multifactored analytical framework focusing on several factors. "Among them [were] the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id., 540. Applying these factors to the facts of the case, the court concluded that the defendant had been denied his due process right to a fair trial and, accordingly, set aside the conviction and ordered a new trial. Id., 548–50.

Despite the *Williams* court's adoption of a multifactored analytical framework with which to determine whether misconduct deprived a defendant of a fair trial, few post-*Williams* decisions used this approach in any detail. C. Champagne, "Prosecutorial Misconduct in Connecticut: A Review," 78 Conn. B.J. 196, 208 (2004). Indeed, it was not until *State* v. *Heredia*, 253 Conn. 543,

---

[3] Specifically, the court explained that: "Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . .

"Prosecutorial misconduct may also occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 538–39.

754 A.2d 114 (2000), and *State* v. *Alexander*, 254 Conn. 290, 755 A.2d 868 (2000), more than one decade later, that our Supreme Court embraced the multifactored approach adopted in *Williams*. Although the *Heredia* and *Alexander* courts reached different conclusions with regard to whether the respective defendants were deprived of a fair trial, both courts conducted a thorough due process analysis by applying the *Williams* multifactored approach.

The next significant development in prosecutorial misconduct analysis occurred in *State* v. *Ceballos*, 266 Conn. 364, 832 A.2d 14 (2003). In *Ceballos*, which involved claimed prosecutorial improprieties similar to those in the present case, the court expressly separated prosecutorial misconduct analysis into two distinct steps, determining first whether the particular conduct alleged was improper and then turning to the ultimate question of "whether the impropriety . . . deprived the defendant of a fair trial." (Internal quotation marks omitted.) Id., 375. The court explained that these two analytical steps are "separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." Id., 381 n.29. The court further emphasized that "misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." Id. Employing this methodology, the *Ceballos* court first determined that multiple prosecutorial improprieties had occurred and then applied the *Williams* multifactored approach in concluding that the defendant was denied his right to a fair trial. Id., 374–417.

Following *Ceballos*, our Supreme Court again addressed a claim of prosecutorial misconduct in *State*

v. *Thompson*, 266 Conn. 440, 832 A.2d 626 (2003). In that case, the court found numerous occurrences of misconduct, but following its application of the *Williams* factors, reversed this court's conclusion that the defendant was deprived of his right to a fair trial. Id., 467–85. Essentially, the *Thompson* court explained that only egregious misconduct will result in reversal on the basis of a due process violation and stressed that the actions of defense counsel can be crucial to determining whether misconduct has deprived a defendant of a fair trial. The court stated that it "consider[ed] it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . Given the defendant's failure to object, only instances of grossly egregious misconduct will be severe enough to mandate reversal." (Citation omitted; internal quotation marks omitted.) Id., 479–80. Put differently, although improprieties may occur, whether they amount to prosecutorial misconduct, thus necessitating consideration of the *Williams* factors, involves a factual review.

Finally, in *State* v. *Stevenson*, supra, 269 Conn. 563, our Supreme Court provided additional guidance and clarification with respect to prosecutorial misconduct analysis. The *Stevenson* court first explained that, with respect to unpreserved claims of prosecutorial misconduct, "it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test."[4] *State* v. *Stevenson*, supra, 572–73. Rather, the *Stevenson* court held

[4] Under *Golding* review, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the

that a reviewing court must apply the *Williams* factors to the entire trial. Specifically, the court noted that because the application of the *Williams* factors is identical to the third and fourth prongs of *Golding* review, applying both *Williams* and *Golding* would result in "confusion and duplication of effort." Id., 574.

Perhaps more significant to our present discussion, however, the *Stevenson* court also indicated that the two steps of prosecutorial misconduct analysis are not only "separate and distinct," but also sequential. In *Stevenson*, the court stated that *"following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the Williams factors to the entire trial."* (Emphasis added.) Id., 575. The court, therefore, indicated that a reviewing court should not consider the second step of prosecutorial misconduct analysis, the determination of whether the defendant has been deprived of a fair trial, without first determining that misconduct has in fact occurred, and further mandated that the *Williams* factors "must" be applied if misconduct has occurred. Id.

Although other cases will be discussed in greater detail, I note here that those other cases have determined that questions and answers similar to those in the present case crossed the boundaries of proper conduct. *State* v. *Ceballos*, supra, 266 Conn. 377–80 (concluding that prosecutor improperly asked defendant to testify as to veracity of other witnesses, then used answers from improper cross-examination during closing argument); *State* v. *Singh*, 259 Conn. 693, 702–12, 793 A.2d

---

claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

226 (2002) (concluding that prosecutor committed misconduct by asking witness to comment on veracity of another witness and by emphasizing that testimony during closing arguments).

Although cases of this court and our Supreme Court have concluded that similar conduct was not misconduct, those cases blurred the boundary between the two steps of the analysis. In *State* v. *Sells*, 82 Conn. App. 332, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004), for example, a *Williams* factor was used in the first step determination. Id., 337–38 (concluding that prosecutor did not commit misconduct by asking defendant to comment on veracity of witness because prosecutor's question invited by defense counsel). *State* v. *Burton*, 258 Conn. 153, 778 A.2d 955 (2001), involves a similar situation. Id., 165–66 (concluding that prosecutor's comments were invited by defense counsel and, therefore, not misconduct). It appears that, in those instances, the court, in effect, moved directly to a second step analysis without first determining whether the claimed improprieties constituted misconduct. What purported to be a consideration of whether misconduct occurred was, in reality, a consideration of whether the claimed improprieties amounted to a violation of the defendant's right to a fair trial on the basis of at least the first *Williams* factor, that is, invited misconduct. Following the conclusion on the merged steps, the court's decision was then stated in terms of whether misconduct occurred at all. I believe this is not appropriate because the reviewing court, in effect, moved to the constitutional question before resolving the factual question. Consequently, this approach runs afoul of the precedent, established by *Stevenson*, that *"following a determination that prosecutorial misconduct has occurred* . . . an appellate court must apply the *Williams* factors to the entire trial."* (Emphasis added.) *State* v. *Stevenson*, supra, 269 Conn. 575. Furthermore,

this approach is counter to the "[e]stablished wisdom [that] counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *State* v. *Lemon*, 248 Conn. 652, 663 n.15, 731 A.2d 271 (1999).

To my mind, the determination of whether misconduct occurred is an important step, one that a court, confronted with the challenge, must undertake in clear terms.[5] Assessing and controlling prosecutorial misconduct serves an important function in and of itself. As our Supreme Court stated in *Ceballos*, "misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial . . . ." *State* v. *Ceballos*, supra, 266 Conn. 381 n.29. Additionally, controlling misconduct is of particular importance given that "[a] prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer . . . [who] [b]y reason of his [or her] office . . . usually exercises great influence upon jurors." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 701.

Although *Golding* review allows for skipping steps; see *State* v. *Golding*, supra, 213 Conn. 241–42; *Williams* review does not allow it at the present time, at least not until authorized by our Supreme Court. Cf. *State* v. *Ritrovato*, 85 Conn. App. 575, 596, 858 A.2d 296 ("we need not reach the question of whether counsel's argument to the jury constituted misconduct because the claim fails under our due process analysis"), cert. granted, 272 Conn. 905, 863 A.2d 699 (2004). Indeed, prosecutorial misconduct cases are difficult enough

---

[5] Notably, since *Heredia*, much of the Supreme Court's attention has been devoted to analyzing the second, or due process, step of the analysis. The first step, determining whether the claimed improprieties constitute misconduct, remains constant and is based on pre-*Williams* cases. See generally *State* v. *Laudano*, 74 Conn. 638, 645, 51 A. 860 (1902) (concluding that prosecutor's remarks not misconduct because they did not exceed "the limits of fair argument and comment").

without blurring the boundary between the two steps or skipping them altogether. Even when the steps are kept distinctly separate, each reviewing court must make its own assessment from a cold record of whether questions or arguments were improper. Given the fact specific nature of the inquiry, one fact specific analysis may not lead inevitably to another. No bright line test can facilitate the factual determination that each reviewing court must make.

In summary, our Supreme Court has made it clear that the analysis consists of two separate and distinct steps. The first is to identify whether the alleged improprieties constitute misconduct; the second, to determine whether any such misconduct caused a due process violation. The *Williams* factors are employed in the second step but not in the first. The first inquiry is necessarily fact specific and governed by cases bearing directly on the claimed misconduct, in this case, improper cross-examination and improper closing argument. Although certain contextual factors are important, such as whether the alleged misconduct occurred in the presence of the jury; see *State* v. *Stevenson*, supra, 269 Conn. 580 (concluding "that the questions asked outside the jury's presence during a hearing on the defendant's motion to suppress and during the assistant state's attorney's voir dire of the defendant were not improper"); others, such as whether the conduct was invited by defense counsel's conduct, are not. It is also evident that only egregious misconduct is likely to result in reversal. In addition, in the second step analysis, the court's curative instructions, either general or specific, and the failure of defense counsel to object during trial may be important factors. See *State* v. *Thompson*, supra, 266 Conn. 479–80; *State* v. *Beaulieu*, 82 Conn. App. 856, 873–74, 848 A.2d 500 (2004), rev'd in part on other grounds, 274 Conn. 471, 876 A.2d 1155 (2005).

I

## CLAIMED PROSECUTORIAL IMPROPRIETIES

Turning to the present case, my first concern, briefly put, is that the majority makes what purports to be the first step determination by considering the *invited conduct Williams* factor, which is part of the second step inquiry. My second concern is that, in employing this *Williams* factor in the analysis, the majority applies the factor in a way that justifies responsive conduct by the prosecutor that cannot be authorized as *invited* by defense conduct under any circumstances under prevailing law.

I begin by restating the instances of claimed improper cross-examination by the prosecutor, which occurred in front of the jury. In accordance with the two step analysis, defense counsel's conduct is not relevant at this point. On cross-examination, the prosecutor questioned the defendant as follows:

"Q. Okay. So, you heard live testimony today from [the victim] that you went to the residence three times?

"A. Allegedly, yes.

"Q. Okay. That was July 22 twice and August 20 once. You heard that testimony today?

"A. I guess that's what I said.

"Q. *Do you believe that [the victim's] testimony is fabricated?*

"A. *Yes, I do.*

"Q. *And we are to believe you that you weren't there?*

"A. *Yes.*

"Q. Did you hear Officer Dunaj testify that he had a phone conversation with you on July 27?

"A. Yes.

"Q. Did you hear Officer Dunaj testify that you admitted going on the property, you were invited and that you wanted just to get your stuff back; you heard that testimony today?

"A. As I already said.

"Q. *So, he's lying, too.*

"A. *That's not what I told him.*

"A. *So, is it your testimony that [the victim] and . . . Officer Dunaj are both lying to this jury?*

"A. *Well, Mr. Dunaj must be, and [the victim] definitely is.*

"Q. *Okay. But you're not, you are telling the truth—*

"A. *Yes, I am.*

"Q. *—as you sit here today? Why should we believe you?*" (Emphasis added.)

During a later portion of cross-examination, the prosecutor again returned to this line of questioning:

"Q. *So, when the officer testified here today that you admitted going to the property and that you knew of the protective order, that officer on this [witness] stand, sworn in front of this jury, was lying?*

"A. *Yes, he was perjuring himself.*

"Q. *But you are not perjuring yourself?*

"A. *No, I am not.*

"Q. And is it your testimony that your belongings were being stored after your arrest at [the victim's] residence?

"A. Yes, as far as I know. I never went and got them, so—that's what she stated.

"Q. You heard [the victim] testify today that on August 20, you came on the property to come and get your belongings; did you not hear that testimony?

"A. I heard that testimony, yes.

"Q. *So, she is lying, too?*

"A. *Yes, she is.*

"Q. *But you're telling the truth?*

"A. *Yes, I am.*

"Q. *And we are supposed to believe you?*" (Emphasis added.)

At this point, defense counsel objected on the ground that the question had been asked and answered. The court sustained the objection, and the prosecutor continued cross-examination:

"Q. Is it your testimony that since the incidents of July 20—July 22 and August 20, that you have not gone to the [victim's] premises . . . ?

"A. Yes.

"Q. *So, is it your testimony that the testimony we heard today is fabricated?*

"A. *Yes.*" (Emphasis added.)

Thereafter, the prosecutor concluded with the following:

"Q. *And you expect us to believe this? I withdraw the question. So, all of the other witnesses that testified in this case are all lying?*

"A. *Yes.*" (Emphasis added.)

Subsequently, during closing argument, the prosecutor emphasized the defendant's cross-examination testimony as follows: "But we are dealing with July 22 and

August 20 here. What happened then? *Who claims all the other witnesses are lying? . . .*

"[*The defendant*] *testified under cross-examination when I asked him why the other witnesses would lie, and he said, well, the officer would lie because he needs, he wants to get the conviction.*" (Emphasis added.)

During rebuttal argument, the prosecutor also stated: "If you believe it's not a violation, you'd have to totally discount all of [the victim's] testimony, and why would you do that?"

In assessing the prosecutor's questions and argument under the first step principles, it is clear to me that the questions pertaining to other witnesses' veracity and the closing argument emphasizing those same improper questions and their answers were improper conduct. In *State* v. *Singh*, supra, 259 Conn. 706,[6] our Supreme Court adopted the "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity." There, as is the case here, the defendant claimed that the prosecutor engaged in misconduct by compelling the defendant, during cross-examination, to comment on the veracity of other witnesses[7] and then improperly emphasized that testimony

[6] Although the *Singh* decision involved a blurring of the first and second steps of prosecutorial misconduct analysis; see *State* v. *Singh*, supra, 259 Conn. 716 n.22; it is significant that it preceded both *Ceballos* and *Stevenson*, the decisions that clarified the "separate and distinct" two step approach.

[7] On cross-examination, the *Singh* prosecutor questioned the defendant as follows:

"Q. It is your testimony here, is it not, that you were not present when the dog alerted to your shoes, right?

"A. I was in the apartment.

"Q. But you didn't see it happen?

"A. No.

"Q. And you recall that's different than what the people who were handling the dog said and [w]hat the detective said, right? Do you recall that's different than what they testified to?

"A. Yes.

"Q. *And are they lying about that?* You shrugged your shoulders. Does that mean I don't know?

during closing argument.[8] Id., 704–706. In concluding that the prosecutor's conduct was indeed improper, the *Singh* court explained that (1) "questions that ask a defendant to comment on another witness' veracity invade the province of the jury," which includes the determination of witness credibility, and (2) "questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find

"A. I don't know.

"Q. In fact, when you saw the dog alert to them and they said the dog has said there is some kind of flammable [liquid] on those shoes you immediately said 'I wore those shoes to the restaurant after I talked to you last night,' didn't you? Yes or no? Did you understand the question?

"A. No. . . .

"Q. The police told you they believed there was some kind of flammable liquid on your shoe[s]?

"A. They don't tell me nothing. . . .

"Q. Did they tell you why they wanted to seize your shoes?

"A. Because I gave them the shirt, my pants and they said the dog—they told me the dog pointed [to these] shoes, we have to take it. I said no problem, take it.

"Q. So when they testified that in fact they informed you that they believed there was gasoline on the shoes, *they were wrong or lying, correct?*

"A. They told me they want to take shoes. I say okay." (Emphasis added; internal quotation marks omitted.) *State* v. *Singh,* supra, 259 Conn. 704–705.

[8] The following closing argument by the prosecutor occurred in *Singh:* "What does [the defendant] tell you? He insists on telling you that he's telling the truth. At the most damaging point in his testimony, he remembers all these details about that night but he [forgets] exactly what he said when the dog alerts [to] his shoe. And why does he have to tell you that? He has to tell you that he doesn't remember it because otherwise he has to directly call [a police officer and a fire investigator] liars when they tell you . . . what [the defendant] does [when] the dog alerts on the shoes in his presence, they told him what the dog—what that means and [the defendant] says 'I wore these back to the scene.'

\* \* \*

"*So everyone else lies. . . . [T]hey all must be lying because you're supposed to believe this defendant, this defendant who is the only person who continually tells you and almost always at key moments in the testimony when there is some question that is . . . hard to answer . . . without looking like [he is] guilty, that is when he said 'I'm telling the truth' . . . .*

\* \* \*

"Again, remember that if you buy the argument that [the eyewitness] couldn't have done it, couldn't have seen what he says he saw, then you

that the witness has lied." Id., 707–708; see also *State v. Ceballos*, supra, 266 Conn. 380 (relying on *Singh*, court "conclude[d] that the line of questioning about whether [a state's witness] was lying, and its use by the state's attorney in closing argument, constituted misconduct").

With respect to *Singh* violations, our Supreme Court has also stated that "[c]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; internal quotation marks omitted.) *State v. Thompson*, supra, 266 Conn. 470–71.[9]

In the present case, the record reveals that the prosecutor repeatedly questioned the defendant about whether the state's witnesses were lying and emphasized that line of questioning during closing argument. In addition, the prosecutor suggested during closing argument that in order for the jury to conclude that the defendant was innocent, it must conclude that the state's witnesses had lied. In light of the precedent established by *Singh*, *Ceballos* and *Thompson*, a "separate and distinct" first step analysis reveals that the

---

have to conclude that [*the eyewitness*] *lied.*" (Emphasis added; internal quotation marks omitted.) *State v. Singh*, supra, 259 Conn. 705–706.

[9] In *Thompson*, our Supreme Court concluded that it was improper for the prosecutor, during his rebuttal closing argument, to state that "[f]or you [the jury] to believe that the defendant is innocent, you must believe that [two state witnesses] are both lying. You must believe that when they got up on the [witness] stand and took the oath they committed perjury." (Internal quotation marks omitted.) *State v. Thompson*, supra, 266 Conn. 470.

prosecutor's questions and argument constituted misconduct.

I note, moreover, that the state has conceded that the prosecutor, during his initial and rebuttal closing arguments,[10] expressed his personal opinion on the

[10] During closing argument, the prosecutor stated: "Why, ladies and gentlemen, would the officer fabricate testimony, fabricate information that's presented to the state's attorney's office and to a judge? *There's no reason because the officer is telling the truth based on his investigation.*

"Why would [the victim] make up this whole story and subject herself to perjury for the charge of issuing a false statement? She's not. She is here in court, *she is telling an honest story with respect to what happened on those occasions.*

"Why would [the victim's brother] fabricate a story and submit himself to [charges of] issuing a false statement of perjury. *Because what he told you is true.* He is living with his sister, [the defendant] showed up on August 20, 2002, attempted to enter the dwelling and left before the police were there and [the victim's brother] called the police.

"*These witnesses are all sworn in. They all understand the obligation of an oath.*

"The other witness we heard from is [the defendant]. [The defendant] is the one charged with these crimes. [The defendant] is the one who denied ever going on the property. Ladies and gentlemen, if you believe the testimony that he never went there, then your deliberations should then deliver a verdict of not guilty.

"But consider. Why would these other witnesses fabricate their testimony when they have nothing to gain or lose depending on the outcome of this trial? *They are merely here to tell the truth.*
* * *
"So, ladies and gentlemen, when you really add up all the testimony, the state feels it's fairly clear beyond a reasonable doubt what happened here. What happened here is that [the defendant] should be found guilty for his actions on July 22, 2002, and August 20, 2002.

"During your deliberation process, I'm going to ask you to carefully consider each of the witnesses' testimony from this chair and think about the things we talked about. If you feel that [the defendant] was the one telling the truth, then it's a not guilty [verdict], but I think clear and careful consideration of the evidence will show you that the four other witnesses, who have no interest in the outcome of the case, are the ones telling the truth and [that the defendant] has fabricated testimony for you to find him not guilty.

"The other thing to consider, the only person other than myself, [defense counsel], the clerk, the court reporter and the judge, who sat through the entire trial, in addition to the jurors, was [the defendant]. The other witnesses were kept out of the courtroom, and they were called in individually. So, they didn't hear each other's testimony. [The defendant] heard the whole trial, the whole state's case. So, he had a perfect opportunity to fill in the

credibility of the witnesses.[11] In addition to those conceded expressions of personal opinion, the prosecutor also expressed his personal opinion by asking the defendant numerous questions, during cross-examination, that implicitly conveyed his disbelief of the defendant's testimony. Among those questions were: (1) "we are to believe you that you weren't there?"; (2) "[w]hy should we believe you?"; (3) "[b]ut you are not perjuring yourself?"; (4) "[b]ut you're telling the truth?"; and (5) "[w]e are supposed to believe you?"

"It is well established that a prosecutor may not express her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . A prosecutor's voucher for a witness is particularly dangerous for two reasons. First, such comments may convey the impression that the prosecutor is aware of evidence supporting charges

---

blanks, to get up there and deny everything they said as all lies. He heard all the testimony; the other witnesses didn't. *The other witnesses came in independently and testified to you, ladies and gentlemen, truthfully.*" (Emphasis added.)

During rebuttal argument, the prosecutor continued in this vein of argument: "If you believe it's not a violation, you'd have to totally discount all of [the victim's] testimony, and why would you do that? *She is telling the truth* as she recollects it. She told the officer on the very day [the defendant] came over twice, clearly in violation of the order.

"She was there August 20, she was in the yard, she was not in the residence. When [the victim's brother] testified she was out, she was out of the house, she wasn't out of the area. Again, if she was out of the area, she couldn't have talked to the police officer who arrived shortly after the call came in.

"*[The victim] is not lying. [The victim's brother] is not lying. [The police officer] is not lying. There is only one person that's lying, and that's the person who has the interest in the outcome of the case.*" (Emphasis added.)

[11] The state expressly admitted in its brief that "[h]ere [referring to the prosecutor's initial and rebuttal closing argument], without question, the trial prosecutor, during closing argument, expressed his personal opinion on the credibility of the witnesses."

against the defendant of which the jury has no knowledge. . . . Second, the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 304–305, 755 A.2d 868 (2000). "While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002).[12] Such "[i]mproper comments on the part of the prosecutor regarding the veracity of one party over the other can easily skew a proper jury deliberation." *State* v. *Alexander*, supra, 305. Accordingly, I conclude that the prosecutor improperly expressed his opinion with respect to witness credibility.[13]

## II

## DUE PROCESS ANALYSIS

Having determined that the improprieties in the prosecutor's cross-examination and closing argument did constitute misconduct, I move to the second step inquiry, that is, whether the misconduct deprived the defendant of his right to a fair trial. As noted previously, "[i]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other

---

[12] I note that in light of our Supreme Court's recent decision in *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), it is a closer question whether the state's expressions of personal opinion made during closing argument, although conceded, constitute misconduct.

[13] I also note, without expressly finding, that the prosecutorial improprieties in this case appear to implicate rule 3.4 (5) of the Rules of Professional Conduct, which prohibits a lawyer from stating "a personal opinion as to . . . the credibility of a witness . . . ."

jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540. I now examine each of these factors seriatim and conclude that the defendant was deprived of his right to a fair trial by the prosecutorial misconduct in the present case.

## A

### Whether the Misconduct Was Invited

At first blush, it appears that the prosecutor's cross-examination of the defendant regarding the credibility of other witnesses and his use of that testimony during closing argument was invited, as the majority has concluded. I disagree. It is true that the defense attorney asked improper questions and argued improperly. For example, during direct examination, defense counsel asked the defendant to comment on the veracity of the victim and, during closing argument, expressed his personal opinion as to the victim's veracity.[14] In light

---

[14] During direct examination, defense counsel engaged in the following exchange with the defendant:

"Q. You are telling the jury and the court that [the victim] is lying?

"A. Yes, I am.

"Q. Why would she lie?

"A. I have no idea. I had her arrested. I don't know."

Defense counsel also argued to the jury: "So, who is lying? I submit that it is [the victim] who is lying. Why? I can't tell you why; I can only speculate.

\* \* \*

"Again, I want you to take everything into account; was [the victim] lying? I submit that she was.

\* \* \*

"Again, I can't tell you why [the victim is] lying, but she is. Therefore, I ask you not to find her testimony credible and to find [the defendant] not guilty."

of defense counsel's direct examination, the prosecutor was *invited* to cross-examine the defendant concerning his opinion of the veracity of the victim. That invitation, however, did not permit extensive cross-examination that delved into the defendant's opinion as to the veracity of other witnesses, including himself. One improper question does not justify a barrage of improper questions concerning witnesses other than the one at issue. The doctrine of *opening the door* is a qualified one and "cannot . . . be subverted into a rule for injection of prejudice." (Internal quotation marks omitted.) *State* v. *Morascini*, 62 Conn. App. 758, 766, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001). While *State* v. *Sells*, supra, 82 Conn. App. 332, appears contrary to this position, it is distinguishable on two grounds. First, the statement in *Sells*, that "once [the] door [has been] opened, the prosecutor ha[s] the right to inquire into the defendant's statement and ask whether *all* the witnesses in the case were lying"; (emphasis added) id., 338; went far beyond the facts of that case. Second, that statement, I submit, does not find support in Connecticut case law, including *State* v. *Burton*, supra, 258 Conn. 153, the only case cited for the proposition.

In addition, the present case involves far more egregious conduct on the part of the prosecutor than that of the prosecutor in *Sells*. There, the prosecutor, during cross-examination, asked the defendant a single question relating to the veracity of a state's witness. In contrast, the prosecutor in the present case questioned the defendant repeatedly, with respect to the veracity of all of the state's witnesses, and then exploited that improper cross-examination during closing argument. Moreover, I agree with the defendant that defense counsel's closing argument was necessitated by both the prosecutor's cross-examination and the prosecutor's first closing argument.

## B

### The Frequency and Severity of the Misconduct

I next consider the frequency and severity of the misconduct in this case and conclude that the misconduct was both frequent and severe. My review of the record reveals numerous instances of improper questions or statements by the prosecutor. These improprieties were pervasive. They occurred throughout the cross-examination of the defendant and during the state's initial and rebuttal closing arguments. Moreover, both forms of misconduct, (1) questioning the defendant regarding the credibility of other witnesses and (2) expressing personal opinion regarding the credibility of witness, involved the ultimate issue of the case, credibility. The prosecutor's misconduct, therefore, occurred during both portions of the state's case and directly involved the determinative issue. See State v. Beaulieu, supra, 82 Conn. App. 873. I recognize the significance of defense counsel's failure to object at trial to the substance of the prosecutor's cross-examination and closing argument. When credibility, however, is the pivotal factor, as in the present case, "such a failure cannot be dispositive." Id. ("[a]lthough the absence of a contemporaneous objection might excuse this misconduct in other circumstances, it cannot do so in the case of the credibility contest that [dominates a] case").

## C

### The Centrality of the Misconduct to Critical Issues in the Case and the Strength of the State's Case

As the majority and the state acknowledge, the state's case hinged solely on a credibility contest between the defendant and the state's witnesses. The misconduct in this case, (1) questioning of the defendant regarding the credibility of other witnesses and (2) expressing personal opinion regarding the credibility of witnesses,

like the misconduct in *Singh* and *Alexander*, is particularly troubling because it is inextricably connected to the critical issue of credibility. See *State* v. *Singh*, supra, 259 Conn. 707 ("[D]eterminations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury." [Citations omitted; internal quotation marks omitted.]); *State* v. *Alexander*, supra, 254 Conn. 305 ("[Expressions of personal opinion] are likely to sway a jury in favor of the prosecutor's argument without properly considering the facts in evidence. This is especially significant in the present case, where the credibility of the victim and the defendant comprised the principal issue of the case.").

Moreover, the fact that this case was determined solely by weighing the credibility of the witnesses supports the conclusion that the state's case was not strong. See id., 308 ("state's case was not particularly strong in that it rested on the credibility of the victim" [internal quotation marks omitted]). Although our Supreme Court has indicated that the absence of conclusive physical evidence does not automatically render a case weak, it is axiomatic that "that same absence surely does not strengthen the state's case against the defendant." *State* v. *Ceballos*, supra, 266 Conn. 416. Indeed, absent additional evidence to support a finding of guilt, the prosecutor's multiple questions and comments suggesting that the defendant had lied and that the state's witnesses were "merely [in court] to tell the truth" takes on increased significance. See id., 416–17 ("without independent physical evidence to prove that the defendant had sexually assaulted [the victim], or even that [the victim] had been sexually assaulted at all, the significance of the state's attorney's improper conduct increases considerably").

## D

### Curative Instructions

The court gave no specific curative instruction, nor did defense counsel request one or object to the substance of any of the prosecutor's cross-examination or closing argument. The defendant, therefore, bears responsibility for this misconduct going uncured. See *State* v. *Thompson*, supra, 266 Conn. 483. The court did give the jury general instructions.[15] Our Supreme Court, however, "has not established a bright line rule about the corrective power of general instructions. Compare

---

[15] In its initial charge to the jury, the court provided the following instructions: "Your function, the function of the jury, is to determine the facts. You are the sole and exclusive judges of the facts, you alone determine the weight, the effect, the value of the evidence, as well as the credibility and believability of the witnesses. You must consider and weigh the testimony of all the witnesses who appear before you. You alone are to determine whether to believe any witness to the extent to which any witness should be believed. It is your responsibility to resolve any conflicts in testimony which may arise during the course of the trial and to determine where the truth lies."

During its final instructions, the court further explained: "You alone are responsible for determining the facts. It is your exclusive province to deal with the evidence and determine what the facts are and to reach the final conclusion as to whether the accused is guilty or not guilty. By applying the law as I give it to you to the facts as you find them to be, you will arrive at your verdict. You are the sole judges of the facts. It is your duty to find the facts. You are to recollect and weigh the evidence and form your own conclusions as to what the ultimate facts are. You may not go outside the evidence introduced in court to find the facts. . . . Also, your verdict must be based absolutely and solely upon the evidence given to you in the trial of the case. . . .

"You should keep in mind that the arguments, the statements by the attorneys in final argument or during the course of the case, are not evidence. You should not consider as evidence their recollection of the facts, nor their personal beliefs as to any facts or as to the credibility of any witnesses. Nor any facts which any attorney may have presented to you in argument which that attorney's knowledge was not present—was not presented to you as evidence during the course of the trial. Furthermore, I emphasize to you that if there is any difference between what any attorney recalls as the evidence and what you recall as the evidence, it is your recollection that controls. Follow your recollection, not anyone else's."

*State* v. *Ceballos*, supra, 266 Conn. 413–15 (general instruction has only limited curative effect) with *State* v. *Thompson*, supra, 485 (presumption that jury followed court's general instructions). Both cases emphasize . . . that general instructions are only one factor, and not a determinative factor, in evaluating the prejudicial effect of a prosecutor's misconduct." *State* v. *Beaulieu*, supra, 82 Conn. App. 874. Nevertheless, because of the egregious nature of the misconduct in the present case, I am persuaded that the general instructions in this case did not remove the harmful effect of the prosecutor's thumb on the scale of credibility. See id. In sum, given the other factors and the importance of credibility in this case, I conclude that the defendant's fair trial right was violated. Accordingly, I would reverse the convictions.

For the foregoing reasons, I respectfully dissent.