******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* MORICE W.*
(AC 38776)

Sheldon, Keller and Elgo, Js.

*Syllabus*

Convicted of the crimes of risk of injury to a child and assault in the third
degree in connection with serious physical injuries that were sustained
by his infant daughter, the defendant appealed to this court. The victim
had suffered six different fractures at different times in the first four
months of her life. The defendant and the victim's mother, both of whom
denied having any knowledge of the cause of the victim's injuries, were
tried together before a jury, which found the mother not guilty. The
defendant claimed that he was denied his due process right to a fair
trial when the prosecutor appealed to the jurors' sympathy for the victim
when she asked the jurors during closing argument to consider how
much pain the victim had suffered in the first four months of her life
and commented that, during voir dire, a member of the venire panel
from which the jury had been chosen had described the victim as voice-
less. *Held*:

1. The prosecutor's remarks about the victim's pain were not improper;
   the prosecutor's references to the victim's pain were supported by the
   evidence, and the remarks supported the state's theory that the defen-
   dant had notice of the victim's injuries and urged the jury to draw the
   permissible inference that he knew or should have known that the
   victim was frequently in pain and had exhibited pain, and because the
   prosecutor properly invited the jury to draw appropriate inferences on
   a material issue in the case, there was no need to consider whether the
   remarks deprived the defendant of his due process right to a fair trial.

2. The defendant was not deprived of a fair trial as a result of the prosecutor's
   remark that an unidentified venireperson had described the victim as
   voiceless; although the prosecutor improperly relied on nonrecord evi-
   dence when she invoked the reaction of a venireperson to the victim's
   plight, the prosecutor's remark, when viewed in the context of the entire
   trial, was isolated and not severe, the defendant did not object at the
   time of the prosecutor's argument or seek a curative instruction from
   the trial court, the court's general instructions that the jury must not
   decide the case on the basis of sympathy or emotion were sufficient to
   cure any harm, the remark was not central to the critical issues in the
   case, and the state's case was strong.

Argued February 13—officially released June 26, 2018

*Procedural History*

Substitute information charging the defendant with
the crimes of risk of injury to a child, assault in the
third degree and reckless endangerment in the first
degree, brought to the Superior Court in the judicial
district of Fairfield, geographical area number two, and
tried to the jury before *Kahn, J.*; verdict and judgment
of guilty of risk of injury to a child and assault in the
third degree, from which the defendant appealed to this
court. *Affirmed.*

*James P. Sexton*, assigned counsel, with whom were
*Megan L. Wade*, assigned counsel, and, on the brief,
*Marina L. Green*, assigned counsel, *Michael S. Taylor*,
assigned counsel, *Matthew C. Eagen*, assigned counsel,
and *Emily Graner Sexton*, assigned counsel, for the
appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with

whom, on the brief, were *John C. Smriga*, state's attorney, and *Margaret E. Kelley*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Morice W., appeals from the judgment of conviction, rendered against him after a jury trial, on charges of risk of injury to a child in violation of General Statutes § 53-21 (a) (1)[1] and assault in the third degree in violation of General Statutes § 53a-61 (a) (2).[2] On appeal, the defendant claims that he was deprived of a fair trial on those charges due to improper remarks by the prosecutor in her rebuttal closing argument. Although we agree that one of the prosecutor's challenged remarks was improper, we do not conclude that that remark deprived the defendant of a fair trial. We therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the morning of December 14, 2012, the defendant's mother took the victim, the defendant's four and one-half month old daughter, to her house. The defendant's mother customarily watched the victim while the defendant and the victim's mother were at work. While she was changing the victim's diaper, the defendant's mother noticed that the victim's leg was swollen and appeared to be causing her pain. She thus called the defendant at work to inform him of what she had observed, to which he responded that he would "get [the victim's] leg checked out . . . ."

The defendant's mother returned the victim to the defendant's and the victim's mother's home sometime after 4 p.m. Thereafter, at approximately 6 p.m. that evening, the defendant and the victim's mother took the victim to Pediatric Healthcare Associates, where she was seen by Dr. Richard Freedman. Freedman noticed that the victim's right thigh was "noticeably swollen," four centimeters larger in circumference than her left thigh, and that it was very firm to the touch. He thus instructed the defendant and the victim's mother to take her for an X-ray the next morning, which they did.

Dr. Mark Rosovsky, who examined the X-ray, found that the victim had fractures of her right femur and her left femur, both around the knee. Because of the types and the locations of these fractures, Rosovsky believed that they were nonaccidental in origin, thus causing him to suspect child abuse. Accordingly, Rosovsky recommended that the victim undergo a full body X-ray to detect and document other fractures she might have suffered. The victim's mother thus took her to the Bridgeport Hospital emergency department, where Dr. Justin Cahill examined her. Upon reviewing the victim's X-ray records, Cahill determined that the fracture of her right femur was not of a common type and could not be explained by any known injury. He therefore reported the fracture to the Department of Children and Families (department). The victim was then transferred to Yale-New Haven Hospital for a full body X-ray because the pediatric floor at Bridgeport Hospital

was full.

On December 16, 2012, shortly after midnight, Officer Paul Cari of the Bridgeport Police Department was dispatched to the emergency department of Yale-New Haven Hospital to respond to a call about a "child incident . . . ." When he arrived, he found department social worker Sandra Liquindoli interviewing the victim's mother in the victim's hospital room. Cari and Liquindoli were approached by members of the hospital medical staff, who took them outside of the room after the full body X-ray was taken and informed them that the victim had "approximately" six different fractures in various stages of healing. Liquindoli thus conferred with her supervisor and program manager, who decided to take the victim into custody for her safety by placing her under a ninety-six hour hold. See General Statutes § 17a-101g.

Cari and Liquindoli returned to the victim's room with medical staff and hospital security, and the victim was separated from her mother. The victim's mother was ending a cell phone call as they entered, and she informed them that she had been speaking with the defendant. Cari and Liquindoli asked the victim's mother how the victim had sustained her present injuries. She stated that during her conversation with the defendant, he told her that the victim's injuries were his fault,[3] but she would not respond to their requests for more information on what she meant by that statement. The victim's mother stated that she did not know how the victim had been injured, but she suggested that the injuries could be related to a shot the victim had received, or that they might have occurred when the victim fell from or lunged out of her car seat a week and one-half to two weeks earlier. The victim's mother stated that the victim had fallen in this way on two occasions, both times when her car seat was on a carpeted floor.

After interviewing the victim's mother, Cari and Liquindoli drove to Bridgeport Hospital, where the defendant was working that evening, to interview him. When they initially questioned him about the cause of the victim's injuries, he stated that he had no idea how she had been injured. Thereafter, however, when they informed him that the hospital had found that the victim had several different fractures, his story began to change. First, he told the investigators that he thought that the swelling of the victim's thigh had been caused by vaccinations she had been given on November 21, 2012. Then he told them that there had been "a few times" when he had rolled over on the victim while they were sleeping together in the same bed. After making that statement, the defendant expressly admitted that he had caused the victim's injuries, and stated that he "should just go to jail . . . ." The defendant was not arrested that evening, however.

On the evening of the following day, December 17, 2012, department investigative social worker Miguel Teixeira met with the defendant and the victim's mother. In that meeting, when Teixeira asked them once again how the victim had been injured, they told him of a time in October, 2012, after the victim had become very congested and stopped breathing, when the defendant had performed cardiopulmonary resuscitation on her. They also suggested that the victim might have been injured when she underwent a lumbar puncture,[4] when she fell out of a car seat, or when the defendant rolled over on her in bed.

Several months later, while the victim was still in the department's custody, the department contracted with counselor Gary Vertula and social worker Cindy Perjon to perform an assessment "regarding reunification"[5] of the defendant and the victim's mother with the victim. In the course of that assessment, which was performed in late April and early May, 2013, the defendant and the victim's mother suggested once again that the victim might have suffered her injuries when she underwent a lumbar puncture on August 24, 2012.

Dr. John Leventhal, a pediatrician who works at Yale Medical School and serves as the director of the child abuse program at Yale-New Haven Children's Hospital, was later called in to determine if the victim's fractures had resulted from acts of abuse. Leventhal first confirmed, upon reviewing the victim's full body X-rays from Yale-New Haven Hospital, that the victim had six fractures: one of each of her upper arms, near the shoulder; one of each of her femurs, near the knee; and two of her ribs, both under her left arm.[6] Leventhal concluded that the two rib fractures, which were a couple of weeks old at the time the X-rays were taken, had most likely been caused by acts of abuse, particularly the squeezing of the victim's chest from front to back. The fractures of the victim's arms and legs were all of a type known as "corner" or "bucket handle" fractures because of their distinctive appearance. Such fractures, which are caused by the forceful jerking of the limbs, are uncommon in children. They are believed to link very strongly with a diagnosis of child abuse. In Leventhal's opinion, none of the victim's limb or rib fractures could have been caused by falling from a car seat onto a carpeted floor or being rolled over on by an adult while in bed. Nor, in his opinion, could any such injury have been caused by a lumbar puncture. Finally, Leventhal ordered that tests be conducted on the victim to evaluate the structural integrity of her bones, more particularly by determining if she had rickets[7] or a genetic condition commonly known as brittle bone disease,[8] either of which might have made her prone to suffering bone fractures without abuse. The tests revealed that there was nothing wrong with the victim's bones that would have made her susceptible

to sustaining fractures without abuse. On the basis of his knowledge and experience, Leventhal determined that all six of the victim's fractures had resulted from acts of abuse.

Dr. Amanda Rodriguez-Murphy, the pediatrician who had administered vaccines to the victim on November 21, 2012, testified that, according to her medical records, the victim had suffered from subconjunctival hemorrhages, or visible blood under the whites of her eyes, when she was approximately one month old. Leventhal testified that subconjunctival hemorrhages are "sentinel[s]" for child abuse.

The defendant was arrested on May 7, 2013, under a warrant charging him with risk of injury to a child, assault in the third degree and reckless endangerment in the first degree. The victim's mother was arrested on that same day, under a warrant charging her with risk of injury to a child.

A joint trial on all charges against the defendant and the victim's mother began on May 4, 2015. The state presented evidence at trial that included all of the victim's above-referenced medical records as well as testimony from several witnesses, including the expert medical professionals who had examined, cared for and treated her in the relevant time frame,[9] department employees and law enforcement personnel who had investigated her injuries,[10] and the victim's grandmother and stepgrandmother. At the end of the state's case, the defendant and the victim's mother both moved unsuccessfully for a judgment of acquittal on all charges.

Both the defendant and the victim's mother then testified in their own defense. The defendant testified that, although he remembered telling Officer Cari that he may have rolled over on the victim, he could not think of anything that would have caused the victim's injuries. He denied that either he or the victim's mother had caused the injuries.[11] The victim's mother testified that she did not believe that the defendant would ever hurt the victim, that she had never had reason to question the victim's safety when the victim was with the defendant, and that she herself had never knowingly placed or allowed the victim to remain in a harmful situation. The jury thereafter found the defendant guilty of risk of injury to a child and assault in the third degree, but not guilty of reckless endangerment in the first degree. The jury found the victim's mother not guilty of risk of injury to a child. On June 24, 2015, the court sentenced the defendant on his conviction of risk of injury to a child to a term of ten years imprisonment, execution suspended after eight years, with five years probation, and on his conviction of assault in the third degree to a concurrent term of one year imprisonment. This appeal followed.

The sole issue on appeal is whether the defendant was denied his due process right to a fair trial by one or more alleged improprieties in the prosecutor's rebuttal closing argument. The defendant bases his claim on two alleged improprieties near the end of the prosecutor's rebuttal closing argument. Then, after reviewing and challenging each of the defendant's and the victim's mother's several exculpatory suggestions as to how the victim may have suffered her injuries by accidental means, without notice to either of them of the victim's need for protection, care and treatment, the prosecutor addressed the jury as follows: "But I ask you, ladies and gentlemen, *how much pain* did [the victim] suffer in her short, short four and a half months of life at that point. *How much pain.* And when the state is selecting—when we were in the process of jury selection, obviously you recall you didn't know anything about the case. . . . But the attorneys; the defense attorneys and the state were permitted to tell you that this involved a four month old, injuries to a four month old. And what struck me back then—and *I don't know whether or not it's one of you, or whether or not it was another venireperson, but someone said during voir dire,* but a four month old is voiceless, and she is. [The victim] was voiceless." (Emphasis added.)

The defendant claims that these remarks, which were assertedly unrelated to any issue the jury had to decide in the course of its deliberations, were improper, and thus violated his due process right to a fair trial, in two ways. First, he claims that the prosecutor violated the "golden rule" by asking the jurors to consider how much pain the victim had suffered in the first four months of her life. Second, he claims that the prosecutor improperly appealed to the jury's sympathy on the basis of nonrecord facts by remarking that a member of the jury panel from which jurors had been chosen had described the victim as "voiceless" during voir dire. The state responds that the challenged remarks were not improper, but argues that even if they were improper, they did not so prejudice the defendant as to violate his due process right to a fair trial. We agree with the state that the prosecutor's references to the victim's pain were not improper. We further conclude that, although there was impropriety in the prosecutor's attribution to a venireperson of the description of the victim as "voiceless," that impropriety did not violate the defendant's right to a fair trial under the multifactor analysis prescribed by our Supreme Court in *State* v. *Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987).

We begin by setting forth the applicable law governing our review of claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Sec-

ond, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"Prosecutorial impropriety can occur . . . in the course of closing or rebuttal argument. . . . In the event that such impropriety does occur, it warrants the remedy of a new trial only when the defendant can show that the impropriety was so egregious that it served to deny him his constitutional right to a fair trial. . . . To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 36–37, 975 A.2d 660 (2009).[12] With these principles in mind, we turn to an examination of the remarks challenged in this case.

I

We first examine the propriety of the prosecutor's rhetorical inquiry to the jury, near the end of her rebuttal closing argument: "But I ask you, ladies and gentlemen, how much pain did [the victim] suffer in her short, short four and a half months of life at that point. How much pain." The defendant claims that this remark was an improper golden rule argument, presented solely as an emotional appeal to evoke the jurors' sympathy for the infant victim rather than to support a rational inference as to any fact or issue they might have to decide in the course of their deliberations. Accordingly, he argues, the prosecutor's argument gave rise to an undue risk that the jurors would find him guilty on the basis of their understandable sympathy for the victim rather than a clear-eyed assessment of the evidence claimed to establish his guilt. We disagree.

"A golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy. . . . [In *State* v. *Bell*, 283 Conn. 748, 771, 931

A.2d 198 (2007), our Supreme Court] noted that golden rule claims arise in the criminal context when the prosecutor ask[s] the jury to put itself in the place of the victim, the victim's family, or a potential victim of the defendant. . . . The danger of these types of arguments lies in their [tendency] to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability." (Citations omitted; internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 605–606, 72 A.3d 379 (2013); see also *State* v. *Ciullo*, 314 Conn. 28, 56, 100 A.3d 779 (2014); *State* v. *Campbell*, 141 Conn. App. 55, 63, 60 A.3d 967, cert. denied, 308 Conn. 933, 64 A.3d 331 (2013).

"The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt. It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that [she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Long*, supra, 293 Conn. 38–39.

Our analysis of whether the prosecutor here employed an improper golden rule argument causes us to examine the record for connections between the prosecutor's references to the amount of pain that the victim suffered and reasonable inferences the jury could draw from the evidence as to material facts. In making this determination, we look both to the evidence presented at trial and the closing arguments made by the state, the defendant and the victim's mother.

On appeal, the state argues that the prosecutor's allusion to the victim's pain in the first four months of her life was not improper because the state had presented both direct and circumstantial evidence that the victim had suffered pain in that time frame, and such pain was relevant to an essential element of assault in the third degree, to wit: that the victim had suffered a serious physical injury. The defendant responds by noting that pain is not an essential element of assault in the third degree under § 53a-61 (a) (2) because, under our Supreme Court's decision in *State* v. *Milum*, 197 Conn. 602, 619, 500 A.2d 555 (1985), pain is not a concept embedded in the statutory definition of serious physical injury. Although we are not persuaded by this aspect

of the state's argument on appeal,[13] our review of the record leads us to conclude that the prosecutor's remarks were not improper because the victim's pain was relevant to the theory of the state's case against both defendants on the charge of risk of injury to a child, to wit: that the defendants wilfully or unlawfully caused or permitted the victim to be placed in such a situation that her life or limb was endangered or her health was endangered, or they did acts likely to impair the health of the victim.

The references in the prosecutor's rebuttal to the victim's pain were not only supported by the evidence, but addressed the arguments of the defendant and the victim's mother that the victim had suffered her injuries without notice to them, because they supported the state's theory that the defendants did indeed have such notice. At trial, both the defendant and the victim's mother denied having any knowledge of the cause of the victim's injuries. The defendant acknowledged that he had told Cari and Liquindoli that he had rolled over on the victim multiple times and that her injuries were his fault. He testified, however, that he had felt pressured by Liquindoli's questioning to say that he somehow had hurt the victim. He also testified that he had never seen the victim's mother do anything that might have caused the victim's injuries and that he had not caused those injuries himself. During closing argument, the defendant's counsel emphasized that there was no evidence that the defendant had caused the victim's injuries, and that there was a "lack of testimony from any witness that [the victim] was placed in any kind of situation that was even questionable, much less wilfully and deliberately putting her at risk."

The victim's mother, in turn, testified that she recognized the victim's crying as a sign of pain, and that "when [the victim] did cry, she was screaming." However, she denied ever having any reason to question the victim's well-being. In her closing argument, counsel for the victim's mother argued that her client "did not and could not have known that [the victim] was subjected to some sort of mechanism or act that brought about some very serious injuries." The mother's counsel further argued that "until [the victim] was hospitalized . . . on December 15, [2012], there was not one troubling or discerning event that triggered [the victim's pediatrician's] responsibility to report any concerns to the authorities" and that "if [the doctor] as a medical expert could not determine there was something seriously wrong with [the victim]," the victim's mother certainly could not have known something was wrong.

The prosecutor's rebuttal argument referencing the victim's pain impliedly urged the jury to reject the defendants' testimony and arguments that they had no notice of the victim's serious injuries. Prior to her challenged remarks, the prosecutor noted that the victim's mother

was presumably with the victim often and thus would have known when the victim cried or exhibited pain. She also referred the jury to the testimony of the defendant's mother, who had seen the victim's swollen leg and realized at once that it was causing her pain. By making those arguments, together with her challenged rhetorical inquiry as to how much pain the victim must have suffered in her short life, the prosecutor effectively urged the jury to draw the permissible inference that the defendant and the victim's mother both knew or should have known that the victim—who had exhibited obvious pain when her right femur was fractured, and had suffered six different fractures at different times in her life—was frequently in, and no doubt exhibited, great pain. Such an inference directly supported one of the state's theories of the case against both defendants on the charges of risk of injury to a child. This court previously has held that "arguments inviting the jury to draw reasonable inferences from the evidence adduced at trial . . . patently are proper." *State* v. *Dawes*, 122 Conn. App. 303, 313–14, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010). Because we conclude that, in referencing the victim's pain, the prosecutor properly invited the jury to draw appropriate inferences on a material issue in the case, we need not consider the second step in our analysis of these remarks, namely, whether the alleged impropriety deprived the defendant of his due process right to a fair trial. See *State* v. *Hickey*, 135 Conn. App. 532, 554, 43 A.3d 701 (if impropriety is not identified, then prejudice need not be considered), cert. denied, 306 Conn. 901, 52 A.3d 728 (2012).

II

We next consider the propriety of the prosecutor's remarks attributing a description of the infant victim as "voiceless" to an otherwise unidentified venireperson in the context of this trial. The defendant claims that this remark was improper because it personalized an appeal to the jurors' sympathy by "suggesting that one of their own, a jury member or a member of the venire panel, had commented that [the victim] was 'voiceless.' " He argues that this emotional appeal was unrelated to any facts on which the jury permissibly could rely in reaching a verdict. The state argues that the prosecutor's remark about the victim's voicelessness was fair rebuttal because it was made in response to defense counsel's comments concerning the lack of direct evidence to establish when and how the victim had suffered her injuries. The state contends that the remark about the victim being "voiceless" noted the practical impossibility of presenting direct evidence through the victim due to her age and developmental limitations. We agree with the state that the prosecutor's argument concerning the victim's voicelessness was proper rebuttal, as it was directly responsive to the defendant's argument about the lack of direct evi-

dence of his guilt. We conclude, however, that insofar as the argument invoked the reaction of another venireperson to the victim's plight, it improperly relied on nonrecord evidence.

"A prosecutor, in fulfilling [her] duties, must confine [herself] to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 717, 793 A.2d 226 (2002). That a venireperson made such a comment during voir dire was not in evidence; it was thus improper for the prosecutor to allude to that comment in her rebuttal closing argument.Having found that the prosecutor's remark alluding to the comments of a venireperson was improper, we turn to the question of whether that remark deprived the defendant of a fair trial. The defendant argues that he was substantially prejudiced by the remark, "considering the sensitive nature of the case and the almost certain fact that jurors would instinctively sympathize with an infant . . . ." We disagree.

"To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following factors [set forth in *State* v. *Williams*, supra, 204 Conn. 540]: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Jose G.*, 102 Conn. App. 748, 766, 929 A.2d 324 (2007), aff'd, 290 Conn. 331, 963 A.2d 42 (2009). "[The] burden properly lies with the defendant to prove substantial prejudice." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 141 Conn. App. 69.

Applying the first *Williams* factor, we conclude, to reiterate, that the prosecutor's impropriety was not invited by defense counsel. The state argues that defense counsel invited the prosecutor's remark that the victim was voiceless by addressing the circumstantial nature of the evidence and lack of witnesses to the victim's abuse. Defense counsel stated, in relevant part: "[W]hat we don't know is the how and when these fractures may have occurred, and the state's evidence regarding the how and when is in the form of opinion.

It's in the form of this is my best estimate, this is my expert opinion as to how these may have occurred. There's no actual witnesses to those events, okay. There's no video, there's no nanny cam like we see on a lot of the . . . news reports." The state appropriately argued, in response to this argument, that there was indeed a witness—the victim herself—but that she was incapable of testifying. Defense counsel's statement did not, however, invite the prosecutor to reference the comments of a venireperson during voir dire.

Next, we consider the frequency and severity of the impropriety under the second and third *Williams* factors. This remark was made on one occasion only, as an isolated appeal to the emotions of the jurors that was based on the observations of a fellow venireperson. See *State* v. *Quint*, 97 Conn. App. 72, 93, 904 A.2d 216 (concluding impropriety had not been severe where "it was confined to only a portion of the closing argument"), cert. denied, 280 Conn. 924, 908 A.2d 1089 (2006). The content of the remark was not objectionable in substance, for it was supported by the evidence and responded directly to defense counsel's arguments. In determining the severity of improper remarks, moreover, our Supreme Court has noted that it considers it "highly significant [when] defense counsel fail[s] to object to any of the improper remarks, request curative instructions, or move for a mistrial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 443, 902 A.2d 636 (2006). Only misconduct that is "blatantly egregious or inexcusable" will be severe enough to mandate reversal. Id., citing *State* v. *Thompson*, 266 Conn. 440, 480, 832 A.2d 626 (2003). Here, defense counsel did not object to the prosecutor's remark about the venireperson's comments, much less ask for a curative instruction as to the remark or move for a mistrial. Following our Supreme Court's reasoning in *Thompson*, defense counsel's lack of objection to the challenged remark demonstrates that it was not so severe as to prompt him to move for a mistrial instead of allowing the case to continue on to verdict, or thus to mandate reversal of his conviction and the ordering of a new trial after that verdict was returned.

Turning to the fifth *Williams* factor, the court took curative measures that would have prevented the jury from being unduly swayed by nonrecord facts or appeals to their emotions. The court first instructed the jury, in general terms: "[I]t is improper for any counsel to appeal to your emotions . . . ." Thereafter it reiterated: "It is not proper for the attorneys to . . . appeal to your emotions." The court further instructed the jurors, more specifically, as follows, that they must not decide the case on the basis of sympathy: "In sitting on this case, there may be time—a time where you have feelings of sympathy or compassion, which is only natural. However, in deliberating on this case and in coming to an ultimate verdict, you must be willing and

able to put aside feelings of sympathy and compassion, and emotion and judge this case on the evidence you hear in the courtroom." Thus, although the court did not specifically mention the prosecutor's challenged remark about the comment of a venireperson, it provided the jury with clear direction to treat the remark as improper, and thus to ignore it when conducting their deliberations.

Finally, we turn to the remaining *Williams* factors, the centrality of the misconduct to the critical issues in the case and the strength of the state's case. The prosecutor's reference to a venireperson's comment about the victim's voicelessness was not central to the most critical issue in this case, which was whether the defendant caused the victim's injuries. The strength of the state's case also outweighed any possible prejudice the prosecutor's inappropriate comment may have caused. The state presented the victim's medical records and extensive expert testimony to establish the nonaccidental nature of the victim's injuries, fractures of her arms, legs and ribs inflicted at different times, and the abusive conduct that must have caused them. The state also presented the testimony of multiple witnesses who stated that the defendant had admitted to causing the victim's injuries. The strength of the state's case thus substantially outweighed any possible prejudice arising from the prosecutor's attribution to a venireperson of the description of the victim as one who was voiceless because she could not be heard on her own behalf.

"In determining whether the defendant was denied a fair trial [by virtue of the prosecutor's impropriety] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 287, 973 A.2d 1207 (2009). "[A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." *State* v. *Spencer*, 275 Conn. 171, 178, 881 A.2d 209 (2005). Viewing the improper remark in the context of the entire trial, we conclude that it did not deprive the defendant of a fair trial. Although defense counsel did not invite the remark, it was isolated and not severe. The defendant did not object to the remark at the time of the prosecutor's argument, nor did he seek specific curative instructions with respect to it. The court's general instructions that the jury must not decide the case on the basis of sympathy or emotion instead of properly admitted evidence were sufficient to cure any harm potentially arising from the remark. The remark was not central to any of the critical issues in the case, and the state's expert-supported, admission-based case against the defendant was strong.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony . . . ."

[2] General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when . . . (2) he recklessly causes serious physical injury to another person . . . ."

The jury found the defendant not guilty of reckless endangerment in the first degree in violation of General Statutes § 53a-63.

[3] At trial, she testified that he had told her, "[t]his is my fault, I'm gonna take the blame."

[4] Dr. John Leventhal testified that when the victim was less than four weeks old, she presented to the emergency department with a fever, and that it is standard procedure to administer a lumbar puncture to such patients. Dr. Freedman testified that the purpose of a lumbar puncture is to look for infections.

[5] Prior to the start of trial, the defendant filed a motion in limine to preclude any testimony relating to a previous trial terminating his parental rights with respect to the victim. The state made it clear that it did not plan to elicit such testimony, and the court did not rule on the motion at that time but stated that it would deal with any such issues as they arose during trial.

[6] Leventhal initially testified that the rib fractures were under the victim's right arm. He later corrected himself on the basis of the victim's medical records.

[7] Leventhal testified that rickets is a vitamin D deficiency that can cause fragility in bones.

[8] Leventhal testified that brittle bone disease, the scientific name for which is osteogenesis imperfecta, results in bone fragility and causes bones to have a tendency to fracture.

[9] These experts included Drs. Melinda Sharkey, a pediatric orthopedic surgeon who treated the victim for her fractures; Freedman; Rodriguez-Murphy; Cahill; Kenneth Baker, a pediatric radiologist who reviewed the victim's X-rays in December, 2012; Leventhal; and Rosovsky.

[10] These investigators included Officer Cari and Detective Jessi Pizarro of the Bridgeport Police Department, Vertula, Perjon and Teixeira.

[11] The defendant also presented testimony from Dr. Jennifer Galvin, a pediatric ophthalmologist who conducted an eye examination on the victim on December 16, 2012. The examination was conducted in conjunction with the medical findings of nonaccidental causes of the victim's fractures. Her findings were normal in all respects.

[12] "Although the defense counsel did not object to the prosecutor's statements at the time of her summation and rebuttal, we may still review these claims. [I]n cases involving incidents of prosecutorial [impropriety] that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . The object of the inquiry before a reviewing court in claims involving prosecutorial [impropriety], therefore, is always and only the fairness of the entire trial, and not the specific incidents of [impropriety] themselves. Application of the . . . factors [in *State* v. *Williams*, supra, 204 Conn. 540] provides for such an analysis, and the specific *Golding* test, therefore, is superfluous." (Citation omitted; internal quotation marks omitted.) *State* v. *Campbell*, 141 Conn. App. 55, 60–61 n.3, 60 A.3d 967, cert. denied, 308 Conn. 933, 64 A.3d 331 (2013).

[13] A person is guilty of assault in the third degree under § 53a-61 (a) (2) when he "recklessly causes serious physical injury to another person . . . ." An essential element of that offense is that the defendant recklessly caused the alleged victim to suffer a *serious physical injury*. General Statutes § 53a-3 (4) defines "serious physical injury" as "physical injury which creates

a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (3), in turn, defines "physical injury" as "impairment of physical condition or pain . . . ."

Reading the foregoing definitions together, we note that although physical injury constitutes either pain or impairment of physical condition, each definition of serious physical injury is defined as an aggravated form of impairment of physical condition rather than an aggravated form of pain. Therefore, while evidence of pain may indeed be relevant to proving the infliction or occurrence of a serious physical injury, pain itself, however aggravated, does not itself constitute serious physical injury.

————————————————————